# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHENANDOAH RIVERKEEPER, <br> a program of POTOMAC RIVER NETWORK <br> PO Box 1251 <br> Berryville VA 22611; <br><br> POTOMAC RIVERKEEPER INC., <br> d/b/a POTOMAC RIVER NETWORK <br> 3070 M St., NW <br> Washington, DC 20007; <br><br> POTOMAC RIVER SMALLMOUTH CLUB <br> P.O. Box 1240 <br> Vienna, VA 22183; <br><br> and <br><br> WARREN COUNTY CHAPTER OF THE <br> IZAAK WALTON LEAGUE OF AMERICA <br> PO Box 556 <br> Front Royal, VA 22630, <br><br>           *Plaintiffs*, <br><br> v. <br><br> SCOTT PRUITT, Administrator, U.S. <br> Environmental Protection Agency, in his <br> official capacity, <br> 1200 Pennsylvania Ave., NW <br> Washington, DC 20460; <br><br> and <br><br> UNITED STATES ENVIRONMENTAL <br> PROTECTION AGENCY <br> 1200 Pennsylvania Ave., NW <br> Washington, DC 20460, <br><br>           *Defendants*. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> Civil Action No. _____ |

# INTRODUCTION

1. Pollution of the Shenandoah River has caused algae blooms so severe they have been linked to major fish die-offs, severe decline of underwater aquatic plants, and conditions so unsightly and odorous that some visitors have turned away rather than use the Shenandoah River for swimming, boating, and fishing. Large stretches of the River's surface are regularly covered in green slime, often during the region's busiest tourism and outdoor recreation season. This suit challenges EPA's refusal to require Virginia to remedy the problem as provided by the Clean Water Act.

2. Specifically, this suit challenges the arbitrary and unlawful action of the United States Environmental Protection Agency and its Administrator, Scott Pruitt[1] (collectively, "EPA") in approving Virginia's list of water quality-impaired rivers and streams under the Clean Water Act, despite the State's failure to evaluate data and information demonstrating that the North Fork, South Fork, and main stem of the Shenandoah River and their tributaries (collectively, "the Shenandoah River") are impaired due to widespread algae blooms fueled by uncontrolled or poorly-controlled pollutants including nitrogen, phosphorus, and sediment. Ex. A, Letter and Enclosures from Jon Capacasa, EPA Region III Water Protection Div., to Jutta Schneider, Virginia Department of Environmental Quality ("DEQ") Water Planning Div. (May 19, 2016) ("EPA Approval"); Ex. B, Excerpts from Virginia Water Quality Assessment 305(b)/303(d) Integrated Report for 2014 (May 2016) ("2014 Integrated Report").

---

[1] Scott Pruitt is automatically substituted for former Administrator Gina McCarthy. Fed. R. Civ. P. 25(d).

3. Acting in contravention of the Clean Water Act and its own regulations, EPA approved Virginia's decision based on its conclusion that the state's water quality standards are too "challenging" to apply. EPA Approval at 7.

4. Because of EPA's legally-defective action, the agency also failed to fulfill its duty under the Clean Water Act to identify the Shenandoah River as impaired and to develop total maximum daily loads for algae-producing pollutants, as needed to ensure attainment of Virginia's relevant water quality standards.

5. In failing to disapprove Virginia's deficient list, failing to identify the Shenandoah River as impaired by excessive algae, and failing to promulgate total maximum daily loads for the pollutants causing or contributing to that impairment, EPA failed to fulfill its statutory authority and duty established by the Clean Water Act, 33 U.S.C. § 1313(d)(2), and EPA regulation, 40 C.F.R. § 130.7. EPA's action was also arbitrary and capricious, contrary to law, and short of statutory right, and therefore subject to vacatur under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).

6. Plaintiffs' injuries would be redressed by an order of this Court declaring EPA's approval action unlawful, vacating EPA's approval, and remanding the matter to the Agency with instructions to reevaluate and revise its approval action to conform with the law.

## PARTIES

7. Plaintiff Potomac Riverkeeper Network is a nonprofit corporation existing under the laws of the State of Maryland. Potomac Riverkeeper Network is dedicated to protecting, conserving, and restoring the Potomac River and its watershed, including the Shenandoah River, and ensuring public access to fishable, swimmable waters in the Potomac River watershed, including the Shenandoah River. Potomac Riverkeeper Network engages in active scientific

monitoring of water quality and works to ensure that the Potomac River and its tributaries, including the Shenandoah River, are being properly regulated and protected by applicable federal and state laws.

8. Plaintiff Potomac River Smallmouth Club is an unincorporated nonprofit association whose purposes include: enhancement of recreational fishing by members, primarily for Smallmouth Bass; preservation, protection and enhancement of Smallmouth Bass and the quality and quantity of Smallmouth Bass resources, particularly in the Potomac River watershed; and fostering an environmentally-sound concept of Smallmouth Bass fishing as a sport and heritage to be protected and enhanced for future generations.

9. Plaintiff Shenandoah Riverkeeper is an unincorporated association administered as a program of the Potomac Riverkeeper Network. Shenandoah Riverkeeper works to defend the Shenandoah River against pollution, protect the right to clean water for all residents and visitors to the Shenandoah River watershed, and promote the recreational use of the Shenandoah River.

10. Plaintiff Warren County Chapter of the Izaak Walton League of America is a not-for-profit corporation existing under the laws of the Commonwealth of Virginia. Since 1929 the Chapter has promoted awareness, stewardship and preservation of the woods and waters of the Northern Shenandoah Valley. Among other activities, the Warrant County Chapter hosts families and school groups at its 155-acre farm and 19th century farmhouse located adjacent to a tributary of the Shenandoah River.

11. Plaintiffs are membership organizations with members and staff who use and enjoy the North Fork, South Fork, and main stem of the Shenandoah River and their tributaries for water-contact recreation such as kayaking, canoeing, floating, paddling, wading, fishing,

4

wildlife watching, and other means of aesthetic and recreational enjoyment. Plaintiffs' members suffer recreational and aesthetic injury from uncontrolled or poorly-controlled pollution of these rivers, pollution that interferes with and diminishes their use and enjoyment of the rivers for the activities described above. Such injury has been and will be prolonged due to EPA's failure to disapprove Virginia's defective Integrated Report and its subsequent failure to develop total maximum daily loads needed to ensure attainment of the applicable water quality standards.

12. Defendant Scott Pruitt is the Administrator of the United States Environmental Protection Agency. He is charged with the supervision and management of all decisions and actions of that agency, including those taken pursuant to the Clean Water Act with respect to Virginia. He is being sued in his official capacity only.

13. Defendant United States Environmental Protection Agency is the federal agency responsible for supervising the implementation of the Clean Water Act's requirements in Virginia.

## JURISDICTION AND RIGHT OF ACTION

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

15. This Court can issue declaratory judgment and grant further relief pursuant to 5 U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 2201 and 2202.

16. Plaintiffs have a right to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 through 706.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants' official residence is in the District of Columbia.

## LEGAL FRAMEWORK

18. Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The goal of the Clean Water Act is to eliminate "the discharge of pollutants into the navigable waters," and, in the interim, to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." *Id.* § 1251(a)(1), (2).

19. To achieve these ends, the Clean Water Act requires each state and the District of Columbia to establish and implement water quality standards, subject to review and approval by EPA. *Id.* § 1313(a)-(c).

20. Water quality standards consist of the "designated uses" of a state's waters (such as drinking water, swimming, and wildlife habitat) along with "the water quality criteria for such waters based upon such uses," and such water quality standards "shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of [the Clean Water Act]." 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.2(d). Water quality standards can be expressed in the form of numerical values or narrative criteria. 40 C.F.R. § 131.11(b).

21. The Clean Water Act depends in part on technology-based effluent limitations to help states achieve water quality standards. 33 U.S.C. § 1311(b)(1)(A)-(B). To further ensure that water quality standards are met, each State "shall identify those waters within its boundaries for which" its technology-based effluent limitations "are not stringent enough to implement any water quality standard applicable to such waters." *Id.* § 1313(d)(1)(A). Effluent limitations are "not stringent enough" if they are not adequate to ensure attainment of water quality standards,

or if they are inapplicable to the relevant pollution sources. *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002).

22. EPA regulations require each state to compile and submit a list of the waters so identified (commonly referred to as "impaired") every two years. 40 C.F.R. § 130.7(d).

23. EPA must either approve the list of impaired waters if it meets the requirements of the law, or disapprove the list. 33 U.S.C. § 1313(d); 40 C.F.R. § 130.7(d)(2).

24. The state "shall assemble and evaluate all existing and readily available water quality-related data and information" to develop its list. 40 C.F.R. § 130.7(b)(1), (b)(5).

25. Should a State's evaluation of existing and readily available data lead to a decision not to use the data, the State must provide "[a] rationale for any decision to not use any existing and readily available data and information" to develop the list. *Id.* § 130.7(b)(6)(iii).

26. For the waters identified as impaired, the Act requires States to establish the total maximum daily load of pollutants that can be discharged consistent with the applicable water quality standards, accounting for seasonal variations and including a margin of safety. 33 U.S.C. § 1313(d)(1)(C).

27. If EPA disapproves of the State's identifications, the Act requires EPA, "not later than thirty days after the date of such disapproval," to "identify such waters in such State and establish such [total maximum daily] loads for such waters as he determines necessary to implement the water quality standards applicable to such waters." *Id*. § 1313(d)(2).

28. Virginia's water quality standards regulations provide that "[a]ll state waters, including wetlands, are designated for the following uses: recreational uses, e.g., swimming and boating; the propagation and growth of a balanced, indigenous population of aquatic life, including game fish, which might reasonably be expected to inhabit them; wildlife; and the

production of edible and marketable natural resources, e.g., fish and shellfish." 9 Va. Admin. Code § 25-260-10.A.

29. Virginia's water quality standards further require that "[s]tate waters, including wetlands, shall be free from substances attributable to sewage, industrial waste, or other waste in concentrations, amounts, or combinations which contravene established standards or interfere directly or indirectly with designated uses of such water or which are inimical or harmful to human, animal, plant, or aquatic life." *Id*. § 25-260-20.A. For purposes of applying this standard the regulation further specifies that the "[s]pecific substances to be controlled include, but are not limited to: floating debris, oil, scum, and other floating materials; toxic substances (including those which bioaccumulate); substances that produce color, tastes, turbidity, odors, or settle to form sludge deposits; and substances which nourish undesirable or nuisance aquatic plant life." *Id*. In addition, "[e]ffluents which tend to raise the temperature of the receiving water will also be controlled." *Id*.

30. To prevent water quality backsliding, Virginia's standards also provide that, "as a minimum, existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." *Id*. § 25-260-30.A(1). Existing uses of the Shenandoah River include a variety of types of aquatic contact recreation and aesthetic enjoyment.

31. Plaintiffs are informed and believe, and upon such information and belief allege, that EPA has approved the forgoing Virginia water quality standards under 33 U.S.C. § 1313(c)(3).

32. Virginia has adopted several categories for use in its biennial list of impaired waters. "Category 5" denotes those waters that Virginia has identified as impaired under 33

8

U.S.C. § 1313(d)(1)(A), and therefore identification of waters in Category 5 prompts the State's duty under that subsection of the Act to develop total maximum daily loads to address the impairment. The identification of waters under Virginia's other listing categories does not constitute an identification under 33 U.S.C. § 1313(d)(1)(A) and does not trigger the State's duty to complete total maximum daily loads. 2014 Integrated Report at *i*, 2-4.

## GENERAL ALLEGATIONS

**Virginia's History Of Refusal To Apply Its Narrative Criteria And Designated Uses To Address Excessive Algae**

33. Since at least 2010 Plaintiffs Shenandoah Riverkeeper and Potomac Riverkeeper Network have submitted public comments and letters and have met with staff from Virginia's DEQ presenting evidence and information demonstrating the Shenandoah River's impairment by excessive algal growth and the resulting inability of the River to attain its water quality criteria and designated uses.

34. As detailed below, despite clear and extensive evidence of impairment, DEQ refused to evaluate the available evidence of algal growth to determine whether that evidence supports listing the Shenandoah River as impaired by algae in its 2010, 2012, and 2014 Integrated Reports. Each time, EPA has issued letters approving DEQ's deficient impairment listing.

35. In its public comments on Virginia's proposed 2010 Integrated Report, Shenandoah Riverkeeper submitted photographic evidence and information demonstrating that "algae grows in unnaturally large quantities that can clog portions of the [Shenandoah] [R]iver, making swimming and fishing impossible or undesirable on large stretches of the river." Letter and enclosures from Jeff Kelble, Shenandoah Riverkeeper, to Darryl M. Glover, Virginia DEQ, (Sept. 23, 2010).

9

36. DEQ declined to evaluate that information to determine whether the Shenandoah River should be identified as impaired in the State's 2010 Integrated Report, instead claiming that DEQ has no "listing threshold" and "no attainment goals" for algae or algae-fueling nitrogen and phosphorus. Virginia DEQ, Response to Public Comments Received Regarding the Draft 2010 305(b)/303(d) Water Quality Integrated Report at 36 (Nov. 2010).

37. On April 17, 2012, Shenandoah Riverkeeper nominated the Shenandoah River main stem, North Fork, and South Fork for inclusion in Virginia's annual water quality monitoring plan. DEQ rejected the nomination, claiming that DEQ has no criteria for assessing algae. Letter from C. Stuart Torbeck, Jr., Virginia DEQ, to Jeff Kelble, Shenandoah Riverkeeper (July 27, 2012).

38. In public comments on Virginia's proposed 2012 Integrated Report, Shenandoah Riverkeeper expanded its evidentiary submissions of algae-related impairments, including additional extensive photographic evidence, testimonial letters submitted by almost 70 river users, an informational map tallying the locations and numbers of citizen complaints about algae, and a written summary of the results of a laboratory analysis conducted on a sample of Shenandoah River algae taken from a late-Fall 2010 algal bloom containing several different species of algae. Letter from Jeff Kelble, Shenandoah Riverkeeper, to John M. Kennedy, Virginia DEQ (April 23, 2012).

39. Shenandoah Riverkeeper submitted the same evidence to EPA, along with supplemental information summarizing the results of an analysis conducted using remote satellite sensing technology, which detected high levels of chlorophyll and blue green algae/cyanobacteria in approximately 70 miles of the North Fork Shenandoah River on July 1st, 2010, a typical summer recreation day. Letter and enclosures from Shenandoah Riverkeeper et

al. to EPA (Oct. 25, 2012); Letter and enclosures from Shenandoah Riverkeeper to Ms. Benita Best-Wong, EPA (Nov. 7, 2013).

40. DEQ again refused to evaluate the information and evidence submitted by Shenandoah Riverkeeper for the 2012 Integrated Report, again claiming that DEQ has not adopted a "listing threshold" or "attainment goals" for algae or for algae-fueling nitrogen and phosphorus. *See* Virginia Water Quality Assessment, 305(b)/303(d) Integrated Report (Jan. 2014); Virginia DEQ, Draft 2012 Water Quality Integrated Report Public Comment-Response Document (Jan. 2014). DEQ further claimed that it "has not listed waters solely based on narrative criteria;" has previously evaluated attainment of the designated recreational use based solely on violations of Virginia's numeric water quality standards for fecal bacteria; and only accepts evidence of impairment in the form of DEQ-approved sampling and analysis protocols which do not include protocols for algae. *Id*. at 34-39.

41. Instead of listing the River as impaired in the 2012 Integrated Report, DEQ listed certain sections of the River under Virginia's "Category 2B," defined as waters that "are of concern to the state but no water quality standard exists for a specific pollutant, or the water exceeds a state screening value or toxicity test." *Id*. at 39. Listing a water in Category 2B does not trigger the state's duty to complete total maximum daily loads under 33 U.S.C. § 1313(d)(1)(C).

42. EPA partially approved DEQ's 2012 Integrated Report, while deferring a final decision to either approve or disapprove DEQ's decision not to identify the Shenandoah River as impaired and not meeting water quality standards due to excessive algae. Letter from EPA to Melanie Davenport, Virginia DEQ, regarding partial approval of 2012 Integrated Report (Dec. 12, 2013).

43. Due to EPA's delay in completing its review of the 2012 Integrated Report, Plaintiffs Shenandoah Riverkeeper and Potomac Riverkeeper submitted a 60-day notice of intent to file an unreasonable delay action. Letter from Shenandoah Riverkeeper et al. to EPA (August 5, 2014).

44. Shortly thereafter, EPA approved DEQ's decision not to identify the Shenandoah River as impaired. EPA justified its approval by claiming that "[t]he existing and readily available information does not provide EPA with a basis for determining spatial and temporal extent of impairment, including which portions of the River suffer from the effects of long-term substantial algal growth and which do not." Letter from EPA to Melanie Davenport, Virginia DEQ at 6 (Sept. 23, 2014). Contrary to EPA's claim, Virginia's water quality standards do not specify a particular spatial or temporal threshold for identifying a water as impaired by excess algae.

**DEQ's 2014 Integrated Report And EPA's Approval**

45. Plaintiffs re-submitted the available evidence of algae impairment in the Shenandoah River in their public comments on Virginia's proposed 2014 Integrated Report, along with a detailed technical review by an experienced water quality expert, refuting or addressing all of Virginia's and EPA's prior rationales for refusing to list the River as impaired. Ex. C, Letter from Shenandoah Riverkeeper et al. to John Kennedy, Virginia DEQ (Jan. 30, 2015) (attachments omitted); Ex. D, David Sligh, Technical Review of Evidence to Determine the Presence, Extent, and Consequences of Excessive Algal Growths in the Shenandoah River and its Tributaries, submitted on behalf of Shenandoah Riverkeeper et al. (Jan. 30, 2015) (attachments omitted).

46. Among other things, Plaintiffs provided:

      a.      Over 1,000 photographs and 15 videos documenting excessive algal blooms, including information about date taken and approximate location;

      b.      126 citizen testimonials, including statements of several professional river guides and outfitters, organized and analyzed by date, approximate location, types of impairments observed, and types of algae observed;

      c.      Tables summarizing the results of a systematic study of river transects in the Shenandoah River documenting "extremely high substrate coverage by periphytic algae in many areas during the months of June and July of 2012." Technical Review at 14; and

      d.      A systematic evaluation of the temporal and spatial extent of the problems showing that the evidence supports listing the entire river as impaired due to the effects of excessive algae on the recreational and aquatic life designated uses and Virginia's narrative water quality criteria supporting those uses. *Id.* at 33-35.

47.    Shenandoah Riverkeeper's public comments also describe examples of readily-available evaluation methods used by other states for assessing whether excess algae growth is preventing attainment of applicable water quality standards, using complaints or photographs of algae blooms and excessive algal growth submitted by members of the public. Ex. C at 4-5.

48.    For its 2014 Integrated Report, DEQ again refused to evaluate the evidence to determine whether algae is preventing attainment of Virginia's recreational and aquatic life uses and supporting narrative criteria. DEQ again claimed that it could not or would not assess the evidence absent a numeric "threshold." 2014 Integrated Report at 61. Ex. E, Virginia DEQ, Excerpts from Draft 2014 Water Quality Integrated Report Public Comment-Response Document at 116 (undated).

13

49.     DEQ's refusal to evaluate the Plaintiffs' data and information defies Virginia's water quality standards, which include the recreation and aquatic life designated uses and narrative water quality criteria supporting those uses. 9 Va. Admin. Code §§ 25-260-10.A and 25-260-20.

50.     Instead of evaluating the readily available evidence to make an impairment determination for the Shenandoah River, DEQ announced that it had selected seven "assessment units" comprising a total of 25 stream miles of the Shenandoah River, and classified those segments under Virginia's "Category 3C" for the recreation use. 2014 Integrated Report at 61. Category 3C is defined as waters where there is "data collected by a citizen monitoring or another organization indicating water quality problems may exist but the methodology and/or data quality has not been approved for a determination of support of designated use(s)." *Id.* at 3. Identification of a water as Category 3C does not trigger the state's duty to complete total maximum daily loads under 33 U.S.C. § 1313(d)(1)(C).

51.     DEQ's identification of the specified portions of the Shenandoah River in Category 3C did not comply with DEQ's duties under 33 U.S.C. § 1313(d)(1)(C) or 40 C.F.R. § 130.7(b)(1) or (5).

52.     EPA rejected a number of DEQ's various claims for why it should not evaluate the readily-available evidence of algae-induced impairment of the Shenandoah River.

53.     Among other things, EPA stated that "the lack of a formalized methodology by itself is not a basis for a state to avoid evaluating data or information when developing its section 303(d) list." EPA Approval at 8. EPA also stated that, because "the *Virginia 2014 Assessment Guidance* does not address the types of information submitted by [Shenandoah Riverkeeper] nor provide guidance as to how citizens can submit photographs, testimonials and other similar types

of data," the "lack of a State-approved [quality assurance project plan] alone should not be used to summarily reject data or assume that data is of low quality regardless of the actual quality controls that were employed." *Id*. at 8-9.

54. EPA nonetheless approved the 2014 Integrated Report, citing DEQ's assertion that "implementing the portion of [Virginia's] narrative water quality criterion related to 'substances which nourish undesirable or nuisance aquatic plant life' presents *unique challenges*," and that the criterion "includes a subjective component based upon the perception of river users, making it *challenging to identify impairments* in a manner that is consistently repeatable." *Id.* at 7 (emphasis added).

55. EPA's rationale for approving DEQ's decision is functionally indistinguishable from the reasons DEQ articulated and EPA correctly rejected. EPA's approval conflicts directly with the agency's admonition to DEQ that the state must evaluate the facts and information available to it, and make a determination whether to identify the River as impaired under 33 U.S.C. § 1313(d)(1)(A).

**CLAIMS FOR RELIEF**

56. All preceding paragraphs are hereby incorporated by reference as if fully set forth below.

57. EPA's approval rationale contradicts other statements in EPA's approval document.

58. EPA's approval contravenes the Clean Water Act mandate to identify impaired waters, 33 U.S.C. § 1313(d)(1)(A), as well as EPA regulations implementing that requirement. 40 C.F.R. § 130.7(b)(5), (b)(6)(iii).

59. EPA's approval action falls short of EPA's duty and authority under 33 U.S.C. § 1313(d)(2).

60. For all the foregoing reasons, EPA's approval of Virginia's 303(d) list was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

61. Declare that EPA's approval of Virginia's list of impaired waters is unlawful and arbitrary for the reasons alleged herein;

62. Enter an order directing EPA to disapprove Virginia's list of impaired water bodies and to identify all segments of the North Fork, South Fork, and main stem of the Shenandoah River as impaired by algae-fueling pollutants that prevent attainment of Virginia's designated uses of recreation and aquatic life use and supporting narrative criteria, within 30 days of the Court's order as required by Section 303(d) of the Clean Water Act or, in the alternative, vacate and remand EPA's approval action and direct EPA to complete a new determination that complies with the requirements of the Clean Water Act within 30 days of the Court's order;

63. Retain jurisdiction over this action to ensure compliance with the Court's decree;

64. Award plaintiffs their costs of litigation (including attorneys' and expert witness fees); and

65. Grant such other relief as the Court deems necessary and proper.

DATED: May 30, 2017

/s/ Jennifer C. Chavez
JENNIFER C. CHAVEZ
DC Bar No. 493421
Earthjustice
1625 Massachusetts Avenue, N.W.
Suite 702
Washington, D.C. 20036
202-667-4500
jchavez@earthustice.org

*Attorney for Plaintiffs*